PHILOMEN FOURNIER, Admx., *vs.* YORK MANUFACTURING COMPANY.

York.    Opinion October 2, 1911.

*Master and Servant.  Injury to Servant.  Contributory Negligence.  Burden of Proof.  Evidence.  Statute, 1909, chapter 258.*

The burden is on the plaintiff to show affirmatively that the decedent did not, by his own fault, either directly or by legitimate inference, contribute to the accident which caused his death.

Where the death of an employee was caused by his own act in producing a contact with a fuse box in a power house, it must affirmatively appear that in doing the act he was not negligent, but in the exercise of due care.

Where an employee in a power house was injured apparently by coming in contact with a fuse box, and there was no evidence whether he was reasonably attentive and alert to avoid such contact, and he had worked for defendant some time, during which the power house was constructed, and had worked in the power house, the burden was on the plaintiff to show that the intestate was in the exercise of due care, and did not negligently contribute to the injury which caused his death.

On report.    Judgment for defendant.

Action of tort brought under the provisions of the Public Laws of Maine, 1909, chapter 258, known as the "Employer's Liability Act," to recover damages for the death of the plaintiff's intestate while he was employed in the defendant's power house, and caused by the alleged negligence of the defendant.    Plea, the general issue. At the conclusion of the evidence counsel for the defendant moved that a verdict be directed for the defendant.    The motion was over-ruled.    The case was then withdrawn from the jury and reported to the Law Court with the stipulation that "if the motion for the direction of a verdict for the defendant, should have been granted, or if the decision shall otherwise be for the defendant, judgment shall be entered for the defendant.    If the decision be for the plaintiff, the Law Court is to assess the damages."

The case is stated in the opinion.

NOTE.    Mr. Justice HALEY having been of counsel did not sit.

*Geo. F. & Leroy Haley,* for plaintiff.

*Cleaves, Waterhouse & Emery,* for defendant.

SITTING:    WHITEHOUSE, C. J., SAVAGE, SPEAR, CORNISH, KING, BIRD, JJ.

KING, J.    Action of tort, by the administratrix of the estate, and widow, of Charles Fournier, under the provisions of Chapter 258, Laws of 1909, to recover damages for the death of the plain-tiff's intestate while he was employed in the defendant's power house, alleged to have been caused by the defendant's negligence in not warning him of a danger incident to the place where he was directed to work.    The case is before this court on report.

The plaintiff's intestate and two other workmen were directed by the defendant's "boss piper" to remove a short section of a six inch iron pipe connecting two pumps in the power house and replace it with another piece of pipe to which was to be attached an air chamber.    One of the three workmen, Charles Dawley, was an experienced pipe fitter, and the other two, Fournier and Evans, were common laborers or helpers.    The six inch pipe was parallel

with the floor of the power house and its top eight feet and ten inches above the floor.   The distance from the top of this pipe to the ceiling was seven feet and one inch.   Sixteen inches behind and about thirty-two inches above the six inch pipe, and apparently parallel with it, was a three inch steam pipe.   The distance from the steam pipe to the ceiling was four feet and five inches.   Upon the ceiling of the power house was a "net work" of insulated electrical wires carrying a strong and dangerous current of electricity. Nearly directly over the piece of pipe to be removed and attached to the ceiling was a "fuse box," so called, about seven inches square and projecting down from the ceiling about two inches and a half. To be more descriptive, there were three fuse "blocks" each about seven inches long and two and one-half inches wide placed side by side.   These fuse blocks were of porcelain with brass or copper "terminals" inserted into them to which the wires were attached, and between the terminals was a "fuse," so constructed that in case of a short circuit it would quickly melt or burn out, thus serving as a safety device.   The evidence tends to show that if some part of a person should come in contact with two of the terminals at the same time, or should come in contact with one terminal while the person was standing on an iron pipe or some other thing connected with the ground, when a current of electricity is on the wires, a short circuit would result and the person would receive a shock. The fuse box was not covered in, and accordingly the terminals were exposed.

Mr. Dawley, the experienced pipe fitter, having screwed an eye-bolt into the ceiling about twelve inches from the center of the fuse box, directed the plaintiff's intestate to attach a chain tackle and fall to the eye-bolt for use in removing and replacing the piece of pipe.   Dawley thus described what he saw of the accident to Fournier: "Q.   How did he start to get up?   A.   He passed the chain and fall to Evans on the pump, got up on the pipe himself, and Evans passed him the fall. . . . Q.   What happened then, what do you next know?   A.   The next I knew Mr. Evans hollered. . . . Q.   Did you look up?   A.   I looked.   Q. Where was Fournier?   A.   Well, he appeared to be hanging up in

some way. Q. Hanging on the pipe? A. No, up overhead somewheres. Q. Seemed to be hanging to the ceiling, didn't he? A. Yes. Q. Did he still hold the tackle and fall? A. He did. Q. What did you do? A. I hollered for them to shut off the power. . . . Q. Did they shut it off? A. They did. Q. What happened then? A. He dropped. Q. To the floor? A. Yes. Q. What he had in his hands dropped with him? A. It dropped first. . . . Q. He never showed any signs of life, did he? A. No, sir: he didn't."

In cross examination Mr. Dawley was asked if he did not state to a representative of the defendant company on the day of the accident that when he looked up Fournier's feet were on the six inch pipe, and he answered "That is the way it looked to me." "Q. That is the way it looks to you now as you recall it? A. Yes." He further stated that as he looked up it appeared to him that Fournier was standing apparently erect with his hands in front of him still holding the chain tackle. Evans was not at the trial, neither party knowing of his whereabouts. Dr. Thompson who was called to the power house immediately after the accident and examined the body before it was removed noted a small abrasion, "a place where the skin was scraped off," above the eyebrows, but discovered no other marks or external evidence of injuries. The undertaker, Mr. Bradbury, testified that in addition to the slight abrasion of the skin which the Dr. noted he discovered, in his examination of the body at the morgue, "a small red spot on the top of the head. Q. What did the red spot have the appearance of? A. Well, that would indicate several things, of course, but it was similar to a little burn, not a wound or any thing of the kind, a very small place it was. . . . Q. As large as what? A. I should say about the size of a dime, as I recall it now. Q. It looked red? A. Just a little red." The foregoing is substantially all the evidence relating to the cause of Fournier's death.

The plaintiff contends that it can be reasonably and logically inferred from this evidence that Fournier's death was caused by an electric shock resulting from a contact of the top of his head with the fuse box.

On the other hand the defendant insists that such is not a reasonable inference, contending that if a current of electricity sufficient to produce instant death had entered Fournier's body there would have been more external evidence of it than the very small red spot on the top of the head, as testified to by the undertaker, but not discovered by the physician; also that if Fournier stood on the six inch pipe, as it appeared to Dawley he did, or if he stood with one foot on that pipe and the other on the three inch steam pipe, it would have been physically impossible for his head to have come in contact with the fuse box; and, still further, that it is unreasonable to suppose that he attempted to stand with both feet on the three inch steam pipe which was only four feet and five inches below the ceiling.  Moreover, the defendant urges that under all the circumstances disclosed in the case it is not unreasonable to conclude that Fournier's death was the result of heart disease, and in support of this the plaintiff relies upon the testimony of Dr. Thompson as tending to show that death from heart disease might be as sudden as the death of Fournier, and that he discovered nothing in his examination of the body that enabled him reasonably to determine whether his death was caused by an electric shock or by heart disease.

The defendant also claims that there was no negligence on its part in not expressly warning Fournier of the fuse box and its dangerous character, because either he knew of it, or by the exercise of ordinary care would have known of it, and further because it was not reasonably to be anticipated that the three workmen would undertake to secure a tackle to the ceiling of the power house among the electric wires and beside the fuse box, when the work to be done could have been performed in an easier and safer way from the floor. Again the defendant contends that Dawley, who directed Fournier to hook the tackle to the eye-bolt, was not a person "who was entrusted with and was exercising superintendence, and whose sole or principal duty was that of superintendence, or in the absence of such superintendent" was "acting as superintendent with the authority or consent" of the defendant, within the meaning of Chapter 258, Laws of 1909.

We do not find it necessary however to determine the question of the defendant's negligence, nor whether Dawley was a superintendent, within the terms of the statute, since in the opinion of the court the plaintiff's case is otherwise fatally defective.

The defendant's contention that the cause of Fournier's death is not sufficiently proved, but is left as a matter of conjecture only, is not without much weight, and yet, if that were the only objection to the plaintiff's case we might hesitate to decide that from all the evidence an inference might not reasonably be drawn that in some way Fournier received an electrical shock which caused his death. But assuming that inference in the plaintiff's favor, still the case is fatally defective, for there is no evidence to show that the deceased was in the exercise of due care. The burden was on the plaintiff to show affirmatively, either directly or by legitimate inference, that Fournier did not by his own fault contribute to the accident which caused his death. This principle is firmly settled in the decisions of this court. See *Gleason* v. *Bremen*, 50 Maine, 222; *State* v. *Maine Central R. R. Co.*, 76 Maine, 357; *McLane* v. *Perkins*, 92 Maine, 39; *Cunningham* v. *Iron Works*, 92 Maine, 501. The case is clearly distinguishable from those where a plaintiff is injured while merely passive in the care of the defendant, without any active agency on his own part in the matter, or, where a laborer, rightfully in his place in the performance of his duty, is negligently injured by some extraneous interference not reasonably to be anticipated in the exercise of the care to be expected of prudent men in like situations, or where he has an assurance, express or implied, that he will receive timely warning of any such interference, as pointed out in *Maguire* v. *Fitchburg Railroad*, 146 Mass. 379. In this case Fournier was not passive in the care of the defendant, but active. It was his act that produced the contact with the fuse box, if there was a contact, and therefore it should affirmatively appear that in doing that act he was not negligent but in the exercise of due care. But of this there is no evidence. Dawley says that he (Fournier) "got up on the pipe himself, and Evans passed him the fall." What he did further does not appear — it is wholly left to conjecture.

There is no evidence tending to show that he did not know of the fuse box and of its dangerous character. He was an intelligent person, had worked for the defendant some time, during which the power house was constructed, and had worked some, at least, in the power house. The room was light and there was nothing to prevent his seeing the net work of wires on the ceiling, and the fuse box was directly before his eyes when he looked up to the eye-bolt. Whether he did in fact know of it before, or then saw it, and appreciated the danger from contact with it, we do not know. He may have. No person who saw the accident itself has informed us how it happened that Fournier came in contact, if he did, with the fuse box. Whether he was reasonably attentive and alert to avoid such a contact, or in a moment of thoughtless inattention by some careless move came against it, does not appear in evidence. The burden was on the plaintiff to show that her intestate was in the exercise of due care and did not negligently contribute to the injury which caused his death. This, in the opinion of the court, she has failed to do, and in accordance with the stipulation of the report the entry must be,

*Judgment for defendant.*